PISTORIO *v.* ZONING BOARD OF HOWARD COUNTY ET AL.

[No. 222, September Term, 1972.]

*Decided April 5, 1973.*

The cause was submitted on briefs to MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

Submitted by *Charles E. Hogg* for appellant.

Submitted by *Thomas E. Lloyd* for Zoning Board of Howard County, part of appellees. No brief filed on behalf of other appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

In this Howard County zoning case the locale is a four mile stretch of the Baltimore-Washington Boulevard, U. S. Route 1 (the road), between West Elkridge and Waterloo. The realty with which we shall be concerned

is a 28.4 acre tract (the property) lying 200 feet back from the northwest side of the road. The Zoning Board (Board) denied the application of the appellant (Pistorio) to reclassify the property from R-12 (Residential) to M-1 (Industrial). The trial judge, Mayfield, J., affirmed the action of the Board and from his order Pistorio has noted this appeal.

At the outset some general conditions should be noted. The road lies between the recently constructed Interstate Route 95 (I-95) and the Washington branch of the Baltimore and Ohio Railroad. I-95 is about one-half mile to the northwest and the railroad is about one-half mile to the southeast. When the area was comprehensively zoned in 1948 land on both sides of the road to a depth of 200 feet was placed in the Commercial A classification. When the area was comprehensively rezoned in 1954 the 200 foot strips were changed from Commercial A to M-1 and, southwest of the property, they were increased in depth to 300 feet. No change was made in respect of the M-1 strips on each side of the road when the area was comprehensively rezoned in 1961 but the 1961 zoning map indicates that about one square mile of land directly opposite the property on the southeast side of the road and extending to the railroad had been reclassified M-2 (Heavy Industrial). The map also shows that several large areas on the northwest side of the road and running to I-95 had been reclassified M-R (Industrial Restricted). The huge appliance park of the General Electric Company is about three miles to the southwest. *Bowie v. Board of County Commissioners of Howard County,* 253 Md. 602, 253 A. 2d 727 (1969). Columbia is about the same distance to the west. There is a four-lane link (Md. Rte 100) between the road and I-95 about 3,000 feet southwest of the property.

Pistorio is the contract purchaser of both the property and the 200 foot M-1 strip between the property and the road. The north and northwest sides of the property border on R-12 land; the land on the west side is zoned

R-12 but within 300 feet it becomes M-R; on the northeast side a stream separates the property from land in the RA-1 (Apartments) classification. The R-12 land, of which the property is a part, was placed in that classification in January 1964, at the request of the Planning Board.

The excerpts that follow are from Pistorio's application for the reclassification:

"6a. The present use of the property is that it is improved by two residences and the balance of the land is not being used for anything."

* * *

"6c. The requested change from R-20 to M-1 is for the purpose of developing the entire tract (along with the current M-1 classification) for those uses permissible under §§ 15.011 and 15.012 et seq., of the Zoning Regulations.

"6d. The Applicant contends that there was a mistake in classifying the property as R-12, as, for all intents and purposes, it lies between U. S. Route 1 and the Interstate I-95, and is not conducive to residential development. Moreover, the frontage along U. S. Route 1 to a depth of 200 feet cannot be utilized in its present classification of M-1 for the reason that subsection 15.022 requires a setback of 50 feet from the highway and § 15.023 requires any building within an M-1 District to be 100 feet from the boundary line of a residential district, which would necessarily compress any development within a 50-foot strip within the M-1 zone. This matter has been before the Planning Board and the Zoning Board of Howard County on many occa-

sions and the record will show that this was one of the reasons justifying a rezoning of the back portion of the particular tract.

"6e. The Applicant contends that there have been many changes in the character of the neighborhood so as to justify the reclassification. These, in part, are

i) Reclassification on December 27, 1966 (Z.B. Case No. 453) of 57.25 acres from R-12 to R-A-1, which property is contiguous to the subject tract;

ii) Reclassification on December 8, 1969, (Z.B. Case No. 530) of 12 acres from R-12 to M-1 which appears on Tax Map No. 38 and is located on the south side of U. S. Route 1;

iii) Reclassification of 23 acres from M-1 and R-20 to T-2 (Z.B. Case No. 380) on September 17, 1965;

iv) Reclassification of 60.3 acres from R-20 to R-A-1 (Z.B. Case No. 537) on March 3, 1970;

v) The installation of public water;

vi) The construction of I-95."

\* \* \*

"6g. The property is served with public water, and public sewerage will be available this year."

The Planning Board recommended the reclassification to M-1 of 24.5 of the 28.4 acres leaving 3.84 acres for use as the stream valley park shown in the 1960 General Plan. Its findings and conclusions were as follows:

*Findings:*

1. The request is not in accordance with the General Plan adopted on July 20, 1960.

2. The property is now bounded by an R-A-1 District on the east which has yet to be developed.

3. Public water is available to the property.

4. Public sewer availability is dependent upon future service by the Bureau of Water and Sewer. The property may be able to be served by the present construction program.

5. The petitioner states that the M-1 property is unusable in its present classification.

6. The petitioner does not state the particular use he intends for the property if the zoning is granted.

7. The property will not have direct access to I-95 and ingress and egress can only be by way of U.S. Route 1. Sight distance to the east is somewhat limited for M-1 use.

8. The area is presently zoned R-12 and could not be buffered from the existing M-R Zone to the west without enormous expenditures.

9. The property is bounded on the east by a significant stream valley which is partially wooded. The 1960 General Plan recommends that the stream valley be preserved as part of a stream valley park.

10. A wide strip for park reservation should be provided on the east of the subject property to preserve the stream and to buffer the future R-A-1 (Apartments) from any industrial activity.

11. There have been numerous changes of zoning along U. S. Route 1 since 1961, to the M-1 District, in order to increase the depth of the existing M-1 "strip" zone area for improved industrial development. Near the subject property, *some* of the Zoning Board decisions reflecting the M-1 changes are BCC Cases 307 [1962], 403 [1965], 427

[1965], 458 [1967], 464 [1967], 504 [1968] and 530 [1969]. (Emphasis added.)

*Conclusions:*

1. There have been numerous zoning changes along U. S. Route One in the vicinity of the property since 1961, which increased the depth of the existing M-1 "strip" zone to allow better utilization of the industrial land.
2. The existing R-A-1 (apartment zone), immediately east of the subject property should be protected by a buffer area from the proposed M-1 District and the proposed stream valley park should be preserved for this purpose from any land development.
3. The Planning Board believes that the reclassification to the M-1 District is the best use of the property if the area immediately adjacent to the stream is preserved by not changing the zoning from R-12 to M-1 for the area within 100 feet of the eastern property line of the property. Therefore, approximately 24.5 acres out of 28.4 acres are recommended for reclassification to the M-1 District.

The application came on for a hearing before the Zoning Board in early March 1971. Pistorio produced a composite map, made up of Zoning Maps 37, 38 and 43, showing, in various colors, changes in zoning made since the comprehensive rezoning of 1961. Included were the seven changes listed in the findings of the Planning Board and three of the changes cited by Pistorio in his application. Pistorio testified in respect of the change in the character of the neighborhood effected by these rezonings and he emphasized the completion of I-95 and its nearby interchange with Maryland Route 100. He spoke at length of the virtual impossibility of utilizing for light indus-

trial purposes the 200 foot strip of M-1 land between the property and the highway. He discussed the availability of water and the imminence of access to public sewers. He conceded the wisdom of excluding the 3.84 acre strip along the stream park; he said he was "willing to comply with it."

Charles Wynn, the first of the two opposing witnesses, farms about ten acres between the property and I-95. The thrust of his testimony is best perceived by the excerpts that follow:

> "Q. You don't know what effect this would have? A. No, I don't.
> "Q. Are you objecting to the case, this zoning? A. I think so.
> "Q. Are you against it? A. I think so. I think so. What about if the factories comes in? We'd be hemmed in."
>
> * * *
>
> "Q. In industrial zoning, they must leave a large percentage of the land open space, and that makes it easier to live next to it. A. Now, we have a lot of people down close to us, how's that going to affect us raising hogs and things like that, and not have people complain something awful. Mrs. Burkett went on about, she had, over at Friendship school house, she claimed she could smell our pigs from over to the school, even though they were, my father was raising pigs on the place himself."

Harry Colwell, the other opposing witness, said he is the operator of a china shop directly across the road from the property. He seems also to have been able to persuade the Zoning Board to reclassify to M-1 a number of the properties he had acquired in the immediate area. In fact three of the seven properties mentioned by the Planning Board, Nos. 464, 504 and 530, were owned by Colwell. He said he opposed Pistorio's application because

he felt there was enough M-1 zoning in the area. Asked when he had reached that decision he said, *"It must have been after I got my zoning."* (Emphasis added.)

At the conclusion of the hearing it was agreed that the case would be kept open for the submission of a report by the Department of Public Works in respect of sewer and water facilities. The report, dated 14 May, is, in part, as follows:

> "The property presently abuts the 12-inch water main which is located in the Washington Boulevard (shown in blue on the attached sketch). Extensions from this main can be provided by developer construction. The area at present does not abut public sewer facilities. The facilities which serve the area are proposed in a Five-Year Program as Project 52-S for Fiscal Year 1973-74, (shown as a dashed red line on the enclosed sketch). Portions of the above project (52-S) could be expedited by developer agreement provided the Deep Run Interceptor (shown in black and identified as Contract 181-S) were operational. Contract 181-S, as of April 30, 1971, was approximately 85% complete, and is expected to be operational by mid-summer.

> "The above study concludes that the requested rezoning will not adversely affect the County's water or sewer systems, provided the area is developed as stated, and that any industrial waste generated within the area meets County Standards."

On 14 June the Board, after considering *"all* of the evidence offered" (emphasis added), found as follows:

> "1. The Petitioner's request is not in accordance with the General Plan of Howard County adopted on July 20, 1960.

"2. Petitioner's property is bounded on the eastern boundary by an R-A-1 District.

"3. Public water is presently available.

"4. Public sewer is not available and will not be available until fiscal year 1973-74 provided the current schedule is maintained.

"5. The subject property is bounded on the east by a stream valley which is shown on the General Plan as part of a stream valley park.

"6. The rezoning request if granted will have an adverse effect on vicinal properties to the east.

"7. That while a problem exists with proper utilization of the 200 foot strip abutting the subject property and U. S. Route 1 in its present classification, it appears that it would be more reasonable to request a zoning change of that parcel to R-12 so that an overall plan for R-12 development could be made for both parcels."

By a vote of four to one the application was denied. Pistorio filed his appeal to the circuit court within the time allowed. Both the Board and Colwell answered. The appeal came on to be heard before Judge Mayfield on 15 February 1972. He filed his opinion and the order dismissing the appeal on 9 August.

Judge Mayfield, in his opinion, "noted that in its findings the Board made no mention, or lack thereof, pertaining either to any mistake in the original zoning or to any changes in the character of the neighborhood which might justify the rezoning." He went on to observe that "it might be said that . . . [Pistorio's] testimony weighed heavily in favor of the granting of the rezoning when compared with the apparent weakness in the testimony of the protesting witnesses . . . ." Moreover he thought "it might well be true that some of the findings of the Zoning Board might be *foreign* to any testimony or exhibits it heard or saw." (Emphasis added.) He said "it might also be true that none of the Board's

findings related to the 'change-mistake' rule . . . ." With so much of what the learned judge has said we find ourselves in hearty agreement. Indeed, in light of its decisions reclassifying to M-1 the properties mentioned in item 11 of the Planning Board's findings, the rather cavalier statement in the Zoning Board's finding No. 7 that it "would be more reasonable" to change the M-1 strip back to R-12 stands out as a curious example of administrative chutzpah. We think Judge Mayfield made a wrong turn, however, when he said:

". . . It is the opinion of this court, within the limits of its understanding, that the expertise which the zoning authority is presumed to possess and which it may apply, is not limited solely to a consideration of the testimony and exhibits offered by . . . [the parties] but that such expertise includes an understanding of the needs of the public, the changing characteristics of the neighborhood and the general purposes of the Zoning Regulations . . . nor does the court find that the action of the Board rebuts the presumption of its expertise in zoning matters. While the . . . testimony might be said to justify the rezoning, it does not . . . impel such action."

In *Board of County Commissioners for Prince George's County v. Ziegler,* 244 Md. 224, 228-29, 223 A. 2d 255 (1966), Judge Horney, for the Court, said:

"There are several reasons for requiring a more comprehensive record of what transpired in this case at the hearing before the district council. Aside from the rule that a zoning authority, in the absence of evidence to support its action, cannot apply its expertise in granting or refusing a zoning change or exception, *cf. Lutherville Community Association v. Wingard,* 239 Md. 163, 210 A. 2d 534 (1965), it is clear

that without a record of the facts on which the zoning authority acted or a statement of the reasons for its action, the reviewing court could not properly perform the duty it had of determining whether the action of the zoning authority was arbitrary or capricious. *Heath v. M. & C. C. of Baltimore,* 187 Md. 296, 49 A. 2d 799 (1946); *Oursler v. Board of Zoning Appeals,* 204 Md. 397, 104 A. 2d 568 (1954); *Temmink v. Board of Zoning Appeals,* 205 Md. 489, 109 A. 2d 85 (1954); *Hedin v. Board of County Commissioners,* 209 Md. 224, 120 A. 2d 663 (1956). The rule is as applicable to a special exception as it is to a reclassification. See *Heath v. M. & C. C. of Baltimore, supra.*

"Where, as seems to be the case here, the decision of the zoning authority is apparently contrary to the weight of the evidence introduced on behalf of the applicants for the special exception, the zoning authority should have stated the reasons for its action and included them in the record. When this is not done, the record should be remanded for the purpose of having the deficiency supplied."

Judge Singley indicated we were of the same mind in *Board of County Commissioners for Prince George's County v. Luria,* 249 Md. 1, 6, 238 A. 2d 108 (1968), when he said, for the Court:

"While it is perfectly true that a zoning authority, in the absence of evidence to support its action, cannot apply its expertise in granting or refusing a zoning change or exception, *Board of County Commissioners v. Ziegler, supra,* it is equally true that where statutory standards are set up, there must be supporting evidence upon which a rational judgment can be based. *Heath v. M. & C. C. of Baltimore,* 187 Md. 296, 305, 49 A. 2d 799 (1946); *Mayor and City*

*Council v. Biermann,* 187 Md. 514, 50 A. 2d 804 (1947)."

And to the same effect *see Crown Central Petroleum Corp. v. Mayor and City Council of Baltimore,* 258 Md. 82, 88, 265 A. 2d 192 (1970).

Section 16.206 of the Howard County Code requires every decision and final order in a zoning matter to be "accompanied by findings of fact and conclusions of law." We think this section requires the Board to provide citizens with something more than the travesty uttered here. Section 16.207 empowers the circuit court to "remand the case for further proceedings" if the rights of the appellants have been prejudiced because the Board's "findings, inferences, conclusions or decisions are:

\* \* \*

"(6) Unsupported by competent, material and substantial evidence in view of the entire record as submitted; or

"(7) Arbitrary or capricious or affected by other error or [of] law."

We think Judge Mayfield should have remanded the case to the Board with a direction to do a proper job.

> *Case remanded, without affirmance or reversal, for remand by the Circuit Court to the Zoning Board for further proceedings. Appellees to pay the costs of this appeal.*